We'll call the next case William Giacone v. Virtual Officeward, LLC. Ms. Watterson. Yes, good morning. May it please the court. The fellow up here, give me a moment, was a bit taller than I am. You can pull that down a bit. It'll come down eventually. Okay, thank you. My name is Kim Watterson, and I represent the defendants, appellants in this case, Virtual Officeware, and David Harrell. And I would like to reserve five minutes for rebuttal, please. That request will be granted. I'd like the court to know that both I and my client understand that there are burdens, perhaps significant burdens, when one comes to this court and asks this court to vacate. An uphill task here. A judgment. It is. When you decide to go non-jury and you go all the way through non-jury, it's a tough burden on appeal. The interesting thing, Your Honor, and this is a side point, but I feel like I do need to say this, and perhaps this is where there may be less difficulty. This may be one of those cases, overturning a verdict after a bench trial as opposed to overturning a verdict after a jury trial. And that is because the district court writes an opinion describing and setting forth in detail the reasons underlying its ultimate conclusion. And that's where the rubber hits the road here. This is one of those cases when you take a good look and a close look at the district court's underlying rationale, compare it to the controlling law on some very basic, simple legal principles in this case, unlike perhaps the argument before me, and looking at the evidence, a contract and a handful of exchanges between the parties. It's apparent that this judgment cannot stand. But where did Judge Schwab clearly err here on his facts? Your Honor, there's really perhaps not a factual error. He asked the wrong question and he got the wrong answer. No disputes. There are no factual questions with respect to what does the contract say. There were a lot of factual disputes between you and your adversary at trial. He resolved several of them. Your Honor, I would disagree that the resolution of the resolution of factual questions or the resolutions were of material questions. Let's look, for instance, at the notice requirement. We have a contract that prescribes specifically what an employee must do in order to provide notice that he or she intends to resign with good reason. That's true. And you also made a big deal about how it didn't get to you the exact way it should have gotten to you. But do you really deny that your client had notice on July 3rd? Our client got the letter on July 3rd, Your Honor. There's no dispute about that. There's a little bit of a technicality, isn't there? I mean, you're amidst negotiations, everyone knows what everyone's talking about, and then you got notice. And it was all by email. Your Honor, and let's not talk about, right now I'm not focusing on, and I will grant you that when it comes to the timing and the method of transmission, but let's look at what the letter said. The good reason provision says you need to invoke the good reason provision, you need to identify which provision on Section 4 which deals with termination that can occur in many, many different ways. You need to describe with reasonable specificity. Well, it's obvious that they were talking about 4A and B or whatever it was. It's obvious you were talking about 4C. It was plain as can be. Your Honor, frankly, I disagree that it's plain in the face of the letter. Well, the District Court thought there was an ambiguity and resolved it against your client. An ambiguity with respect to the letter? Well, your position was that it did set forth whether it was A, B, or C, and that was resolved against you. Well, frankly, if we take a close look at the District Court's opinion, the District Court did not conclude that the letter itself invoked the good reason provision or mentioned good reason. Instead, the Court concluded on what amounts to an immaterial fact, is that virtual office wear must have known or did know that there was the potential for the restructuring to breach the contract. That finding is not a finding that Giacomo provided the contractually required notice that he intended to resign for good reason. The fact that the parties were in the midst of negotiations and if one reads the July 3rd letter recognizing everything that had come before in terms of negotiations, it is inviting further negotiations. It's making a demand. It's ending by saying, unless we can come to a new agreement. There's no dispute that the parties were in the midst of negotiations. As a matter of fact, again, the negotiations cut the other way. This looks like a letter in furtherance of the negotiations that have been going on for a month. Let me take you back to July. Okay. End of June, July 2012. Okay. Do you acknowledge there was a breach? I will acknowledge that the restructuring, if it had gone forward and it had impacted Mr. Giacomo, which it had not as of July 3rd, there was a potential for it to alter his compensation. All right. They altered his compensation as of July 3rd, did they not? As of July 3rd, no. They were paying him a higher salary. They paid him a higher salary. So that was an alteration from what the December 2000, well, it was an alteration from the employment agreement. Yes, Your Honor. What the parties were trying to do was, and this isn't, when I say this isn't a mystery, what I mean by that is this is not something, a fact that I'm pushing back against, that if the restructuring had taken place and there were no longer sales folks working underneath Mr. Giacomo, that would have impacted his commissions. I took you back a year too far. We should be talking about June, July 2013. When it came to overwrite, and that was the whole point of what Mr. Giacomo. I guess I'm trying to focus in here. Your client made changes here, and they impacted Mr. Giacomo. And they were negotiating. Okay. And then on July 3rd, he purports to give notice, right? I disagree, Your Honor, that it is sufficient notice. He purports to give notice on July 3rd. Now, can you prevail, can your client prevail if that notice was insufficient, notwithstanding the existence of a breach? Absolutely, Your Honor, because the good reason provision, it's threefold. Three things happen, and it's right duty, right duty, right duty. First, if there's a breach, the employee pursuant to must strictly comply with Section 4's requirements with respect to invoking the good reason provision. And this is why it is so important that you raise your hand and say, we're not in negotiation world, we're in good reason notice world, because that then triggers the right in the employee to cure. Okay. And by the way, as the employer, so it's not sufficient there's a breach. Your client drafted the agreement. Yes, Your Honor. Okay. Your client put in that short window of five days to cure, and unfortunately, factually, those five days fell over a Fourth of July holiday, which a couple of the five days may not have been productive days, but you had notice, and you had an obligation under your own agreement to cure it. Okay. And it was ultimately cured. What evidence do you have that within five days you properly attempted to cure? Your Honor, I don't want, I do want to answer your question, but let me go back and talk about why it is so important, and I think it does answer your question, that the notice invoke good reason, because you can terminate for a lot of reasons. If virtual officeware had been told, I want you to come and invoke the good reason provision under 4C. Here are the specific four or five things that must be cured, which I claim is a breach. That would have been a flashing neon light. That would have alerted virtual officeware that its clock was ticking. We all write demand letters. I've gotten a bunch of them and have written them myself that says, you need to get back to me immediately. You need to get back to me this day. But absent knowledge that we were no longer in the world of negotiations, that he had pulled, Mr. Giacone had pulled the good reason trigger, thus triggering our contractual right to cure, which ultimately, as the record reflects, they gave in to every one of his demands. Didn't Judge Schwab find that the June 28th email, which was sent to Mr. Giacone and others, that that was enough on your client's behalf that they should have known that this was a good reason termination? That's not the question, Your Honor. Didn't Judge Schwab find that? If I may answer that in two ways. There's nowhere in the opinion where Judge Schwab says the restructuring on June 28th in and of itself amounts to good reason. He points to a David Harrell email and said that's what amounts to the repudiation. So directly answering your question in terms of what the judge found. If I may, and respectfully, this is why that does not matter. Judge Schwab may have, the district court may have concluded that that amounts to a breach. But we have three things going on. And this isn't just breach and you get paid for a contract breach. It is breach, notice that you believe it constitutes good reason, and opportunity to rule. Didn't the judge lay that bare, though, say that you had a hedging, I think he said contradictory position, saying that there was no breach but in any event that what you were doing was perfectly proper under the contract. You were taking both sides against the middle. And I disagree that the record, the judge may have said that, but I disagree that the record supports that. Well, that's what he found, that your position was you did nothing wrong, but at the same time you're saying what you could do, you were allowed to do. The position, Your Honor, that was taken, and I think it's laid out in a very detailed way in our brief, is that the restructuring, if we look at, I think it's on page 990, Mr. Harrell writing to the board, yes, granted, the restructuring would have impacted Mr. Giacome. The restructuring had not yet impacted Mr. Giacome because he, like other folks who would be impacted, he had a contract they were trying to work out the compensation, and at one point Harrell says to the board, really, we have four choices. We can, and I'm using colloquialism because it's in there, give Bill whatever he wants, have the restructuring only impact half of the sales force, or do this or that. But Judge Schwab found that Harrell had already communicated, we're not abiding by this contract, right? So it's not like this was some hidden agenda. He had already said, hey, we're not abiding by it. Judge Chigars, this is why I said this is a legal question, and this is why this particular finding is not entitled to deference. He says what Harrell said in a July 3rd letter amounts to a repudiation. Now, under Pennsylvania law, a repudiation needs to be definitive, clear, unequivocal, plug pulled, I'm out of here. Read Harrell's July 3rd, and I have the page for it. If we look at it, it does not meet that criteria. Moreover, we cite in our brief, I think the exact page is 372 of the record, Mr. Giacomo himself said that Mr. Harrell, when asked what did you think was going on with respect to Harrell's July 3rd email, the district court announced a repudiation, Mr. Giacomo said, and I don't want to misquote this, so words to the effect, well, I thought there were still negotiations going on. I just thought he was taking this position in negotiation, and I didn't like his position, so I had my lawyer send my letter back stating my position. We are not in repudiation world as a matter of law. There's no factual dispute about what Mr. Harrell said. There's no factual dispute about what Mr. Giacomo's July 3rd letter said, but it is a legal question as to whether that letter comports with Section 403. I've got to cut you off because your red light is on, but I do have one last thing. This is not anything you've talked about yet, but under the Pennsylvania Wage Payment and Collection Act, you fought pretty hard on that one. My guess is because it had the attorney fees provision in it. And the liquidated damages provision. All right. Well, let me ask you something. I read the agreement. Paragraph 70 says that your adversary is entitled to attorney's fees anyway. Am I missing something? They are, but they didn't seek attorney's fees under that clause. And it's interesting. They didn't file a straight-up breach of contract case, which would have put us under the ‑‑ which would have given us the possibility to get attorney's fees if we want. But they did not invoke the contractual right to attorney's fees. So you're saying if we agree with you on the Wage Payment and Collection Act, there are no attorney's fees in this case. There are no attorney's fees. That is not the theory of the case. We'll have you back on rebuttal, and we'll call on Mr. Strasburger. Thank you. Thank you, Judge Fischer. May it please the Court, Jordan Strasburger on behalf of William Giacconi. There were a lot of questions asked by the panel, and I did my best to write them down. But I'd like to start with a question that you, Judge Cowan. He's doing all right. He got your pronunciation right. Did you say correct? Correct. You'd asked how could it be any other provision than the good reason provision. And Ms. Waterson said that Judge Schwab didn't address that, and he didn't address that in his final proposed findings. But a review of the record reveals that at the close of our case in chief, they moved for judgment as a matter of law. And Judge Schwab from the bench at the record, JA 412, said it could have only been the good reason paragraph, that any thinking person would know that Mr. Giacconi was terminating for good reason. And in fact, because of the July 3rd letter, which as a factual matter, Judge Schwab found was quite detailed, which did provide for the breaches, the loss of seniority, the restructuring of the sales force. Those were all factual findings. The judge looked at the letter and said that the letter was quite detailed and found that Mr. Horrell's explanation in defense was not believable. That still leaves you with the question under, I understand, Pennsylvania laws are very strict, and when they have a termination clause such as this, strict compliance is required, not substantial performance or whatever, or equitable reasons. So there's no question, I think you acknowledge that, the termination wasn't strictly in accordance with the contract. There were certain provisions that were not strictly. And as I understand, Pennsylvania law is saying there's no termination unless you cross all the T's and dot the I's, exactly as termination requires. Your Honor, I don't see the cases saying that. I see the cases saying that material provisions of notice termination need to be strictly construed with. The case that the defendants cite, the Keystone case, that was a case where the entity that was seeking to terminate the contract, they had to provide 15 days, but instead they terminated within 13 days. As the record reflects, everybody was on board. They had five full days to cure. And what we know from trial is that the defendants only wanted to enter into a new contract. It would always have been acceptable to Mr. Giacconi, this is what his July 3rd letter said, this is what his July 28th letter said, that I just want the contract to be respected. I want all of the changes that were implemented on June 28th, per the memo, to just not apply to me. Ms. Waterson's talking about negotiation mode. That was not the mode that Mr. Giacconi wanted to be in. Mr. Giacconi was pushed into negotiation mode. He had a contract, and he had 18 months remaining on it, and the defendants unilaterally decided to revamp the entire sales force. And yes, Mr. Giacconi did embark in trying to negotiate a new deal, but that didn't happen. And it got so bad that he did send a letter July 3rd saying, okay, we're negotiating, but just let me know that unless we enter into a new agreement, my existing agreement will be respected. And that never came. Let me ask this. If the July 9th email had been timely, came on July 8th, would it have been adequate to be considered pure? Well, technically, no. And I say that because the July 3rd email rejected the July 2nd offer that Mr. Giacconi's attorney sent. So it was, we'll take the $95,000, but we also want the detailed commission statement. And that was important, Mr. Giacconi testified, because the change in the sales force, the commissions went from 12 or 14 percent to 18 percent. But unless he had a commission schedule that locked in that 18 percent, then Mr. Horrell could have changed it four months down the road. So no, the July 9th email, it purported to accept an offer that was extinguished on July 3rd. So your answer is it would not have been sufficient to cure? Well, and remember, the July 9th, no, it wouldn't have been sufficient to cure. Because remember, we're talking about two separate things. Isn't that being overly technical? You want the court to say that you don't need to meet all the technical requirements in the notice, but now you're saying that the July 9th email, if timely, wouldn't be sufficient to cure. Isn't that being over-technical? No, Your Honor, because the July 9th email is not a pure email. The July 9th email is a purported acceptance to enter into a new agreement. Perhaps if Mr. Horrell had said on July 9th, it was the holiday weekend, we didn't really know what was going on, we were scrambling, but we are going to respect your contract, and we're sorry that we're a day late, but we are going to respect your contract. That's not this case. Well, the defendants say that they're trying to attempt to accept the July 8th and 9th within eight days that they should be given to cure and accept. I guess. Correct. Within eight days. Well, they say they didn't have that time. Well, Your Honor, they never sought to cure. Again, the negotiation is distinct from the cure. If at any point after July 8th they'd say, okay, negotiations broke down, but we are going to respect your existing agreement, that's the cure. But this idea that Mr. Giacconi had to enter into a new agreement, that he had to change the agreement in place, just isn't true. He did embark in negotiations. The negotiations were, frankly, forced on Mr. Giacconi, and they broke down. But between July 3rd and July 8th, and maybe, Your Honor, maybe the 9th, maybe the 10th, who knows? If they'd said, okay, things got a little out of hand here, we're going to respect your agreement, that would be a different case, but that never happened. The only course that Mr. Harrell wanted to go on was a new contract, and we know this because Judge Schwab found that when he contacted his board, the only authority that he ever got was to enter into a new agreement. And we know from the record at JA 476 that if a new agreement was not reached, Mr. Harrell testified that Mr. Giacconi was likely to resign, and that's what happened. And I'd also like to draw the Court's attention to some other important testimony that was given by Mr. Looney, who was not a terribly material witness at trial, but he was also a higher-ranking salesperson at virtual office. And there's a finding that Judge Schwab found, and this sort of also goes to repudiation, that the gentlemen, Mr. Harrell, Mr. Giacconi, Mr. Looney, and Mr. Goldberg, they all had dinner at a steakhouse, Rothman's Steakhouse. And what Mr. Giacconi testified in his case was that while all this negotiation was going on, he said to Mr. Harrell, all I want is for my existing employment to get respected. We can talk about maybe entering into a new agreement, but in the meantime, I want my existing agreement to be respected. And what Mr. Giacconi testified was that Dave Harrell said, absolutely not. And Mr. Looney corroborated that. He testified in his case at JA 583 that he didn't remember whether it was Mr. Harrell or Mr. Goldberg, but they said we'd already ruled out all of these changes, and it would have been impossible for us to make a change just for you. So your adversary questioned whether there was repudiation at all. This testimony and finding would support that there was a real repudiation, right? Yes, Your Honor. That, in addition to the June 28th memo, which the defendants really don't acknowledge the importance, notwithstanding the fact that Judge Schwab mentions it no fewer than three times in both opinions. I mean, he brings it up back in the damage opinion. But the June 28th email is very important because it does announce that there's going to be a change in the sales force. And I don't remember which judge brought it up with Ms. Waterson, but, yes, they did increase his salary. It went from 89 to 120, and the reason it was raised was because they implemented the changes. And so there unquestionably is a breach, and the repudiation is the Rothman Steakhouse. It's the June 28th memo, and it's also the July 3rd email that Mr. Harrell sent to Mr. Giacconi that said, we're never going to attach a commission schedule. We're not going to respect your agreement. And as a factual matter, Judge Schwab read that email, heard the testimony, and came to the conclusion that there was a repudiation of the agreement. Okay. Do you have anything else, Mr. Strasburger? Well, I have some time. Can I ask you about what I asked your adversary about, the attorney's fees? Yes. Is it true if you take the same position, if you fail on the Pennsylvania Wage Payment Collection Act, that attorney's fees will not be available? Well, yes. We did not put in a case for attorney's fees. The time to have done that would have been at the trial. We decided to do it under Rule 54, where you have 14 days after the judgment's entered to file your petition. That's what we did. But I want to explain that we're talking about two separate wages here. The underpayment of the ASP, which I'd like to emphasize, was itself a breach of contract. That was one of the breaches, the failure to abide by Schedule A. This is liquidated damages. I'm sorry? This is liquidated damages under Pennsylvania statute, right? Isn't that what you're talking about? Yeah, well, right. I mean, it's a little complicated because we're talking about two separate wages. The failure to pay the ASP, which Judge Schwab found was a breach, that's clearly a wage. There seems to be defendants raising objection to the expectation damages as not being a wage. And as we brief, we think that that case is controlled by Scher. And I don't know if the panel is familiar with a recent case from the Superior Court, Elie v. Susquehanna. I can't read my hand right. I'm sorry. But it's 2005 PA 217. And what that case does is it talks about Scher, and it holds that separation-related wages fall under the wage payment act. And that's what Judge Schwab found, and that allows for the liquidated damages. Let me ask you about the notice question again. The virtual officer argues that the notice requirement is a condition precedent. Do you agree with that? Yes. Is that contrary to your position? The evidence shows that the notice was not strictly in accordance with the contract. Your Honor, the notice was not sent certified mail. It was sent email, and the course of dealing among the parties was email. That's how the parties communicated. Well, doesn't Pennsylvania law require that if there be such a clause, it has to be strictly construed? I'm unaware whether substantial performance or equitable principles factor into that under Pennsylvania law. I don't know myself. But given the basic law that it has to be strictly construed, you should be arguing against yourself, saying it wasn't complied with. Your Honor, I respectfully disagree. Notice was provided, and it was given. They had an opportunity to cure, and they failed to do so. But part of that notice, perhaps the most significant defect in that notice was not citing the good reason provision and not outlining the specifics where the good reason provision was violated. Do you acknowledge that those defects existed in the notice? If I had to pick the worst non-technical compliance, it would be that, yes. Okay. And what we know is that... Let's hone in on that a second. Judge Schwab found that those were technical non-compliance and didn't defeat the requirement of notice. Is that a legal conclusion or a factual conclusion? It's a factual conclusion, Your Honor. And the reason is whether a provision is material or not is a factual conclusion. And what Judge Schwab found was, and the defendants never really were able to point to any evidence in their brief, was that they never even wanted to cure. There's no evidence, and there's no prejudice. One of the themes in their brief... They didn't want to cure, but you don't get the cure here unless you complied with the notice requirement. Your Honor, I think we complied with the notice in all material respects. And we cite in our brief the ACME case, which cites to the restatement 229, and there are equitable principles. This is not strictly construed open-and-shut case. You have to do A, B, and C. Where there is a non-material compliance with a provision, then the courts say that you look at whether the forfeiture is going to be disproportionate or not. And that's a factual determination. And there are exceptions to things being strictly construed. It is not a magic bullet, as Ms. Watterson would like this Court to believe. Okay. All right, Mr. Strasburger, we thank you, and we'll bring Ms. Watterson back for some brief rebuttal since we allowed her to go substantially over the red light. First stop. And I appreciate that. I appreciate being able to answer the questions. What I usually do with rebuttals is tell everybody this is going to be really disjointed, not elegant. I'm just going to read five points, brief points that I have here. I think it's interesting. I'll ask the Court to look at page 29 and 30 of the appellee's brief, telling precisely the point that we did not know we were in what I'm going to call good reason world as opposed to negotiations world. The following statement along the lines. Appellee says, virtual office where it did not know that it had a problem and could be on the hook for good reason payments, and this is not a direct quote, paraphrasing, until after he resigned and invoked good reason. Making it clear, good reason not invoked until after resignation. Didn't know, again, we were in good reason world as opposed to negotiations. This also goes to the issue of materiality. I believe I heard Mr. Strasburger say that when it came to notice perhaps some of the deficiencies, I think the deficiencies in the content letter that never say the word good reason, that clearly is material. How could it not be material in terms of compliance when it is a process of breach, alleged breach, notice, and then cure. It's absolutely material. We knew we were in that world. I'd like to ask the panel, and I was going to read some quotes here, but I'm not going to do that. If one looks both at Mr. Geocone's June 28th letter coming from counsel, JA 558, as well as the notice letter, the purported notice letter, 1039, makes many, many references too. In the absence of a mutual agreement, yes, I'd like my contract to be respected, but in the absence of a mutual agreement, again, language of negotiation, language of negotiation demands. What the contract requires and whether the contract complied with the notice requirements, that's not a factual question. It's not was the light red or was the light green, and two different witnesses disputing that. The letter is there. It's part of the record. We didn't have an oral conversation that one claimed was a good reason notification. So, again, these are legal questions because the facts aren't in dispute with respect to what the documents say. It's the legal consequences of those documents and whether the documents, for instance, the communications comported with the contract's strict requirements. And I will point out, I will not respond substantively on the acne case. Other than to say our reply brief at pages, I believe, 17 and 18 contain a very, I think it's very good and very clear description of acne and why acne does not override the substantial, excuse me, the strict compliance rule in the circumstances of this case. Okay. I thank you. We thank both counsel for excellent arguments in this case, and we'll take the matter under advisement.